FOURTH DIVISION

                                                                                                            December 19, 2002

No. 1-01-0881

JUDY WASHINGTON, Special Adm'r of the Estate of Sabree McKinley, a/k/a/ Sabree Washington, Deceased,

Plaintiff-Appellant,

v.

THE CITY OF EVANSTON, a Municipal Corporation,

Defendant

(St. Francis Hospital, an Illinois not-for-profit corporation, and Therese Kloempken, 

Individually and as Agent for St. Francis Hospital,

Defendants-Appellees).

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

James Varga,

Judge Presiding.

JUSTICE KARNEZIS delivered the opinion of the court:

Plaintiff Judy Washington
 appeals from the trial court's grant of summary judgment to defendants St. Francis Hospital and Dr. Therese Kloempken in plaintiff's action for the wrongful death of her newborn son Sabree Washington McKinley.  Plaintiff alleges that the court erred in finding that defendants were immune from tort liability pursuant to the immunity provisions of the Emergency Medical Services (EMS) Systems Act
 (the EMS Act or Act) (210 ILCS 50/1 
et seq
. (West 1996)) and Dr. Kloempken's conduct was not willful and wanton misconduct.
  We affirm.

On October 4, 1996,
 plaintiff went into labor while in the bathroom of her second-floor apartment in Evanston.  She was 8½ months pregnant.  When City of Evanston fire department emergency personnel arrived at plaintiff's home in response to a 911 call, they saw 
the foot and leg of a baby protruding from plaintiff's vagina.
  The paramedics phoned St. Francis Hospital for instructions 

Dr. Hector Aguilera was the attending emergency room physician and director of the emergency department
 at St. Francis Hospital on duty when the call came in at 2:48 p.m.  He had authority for emergency patient management in the field.  He had previously served as the alternate project medical director for the St. Francis Hospital EMS system and was very familiar with EMS protocols and standard operating procedures (SOPs).  Standard procedure for paramedics and emergency medical technicians (EMTs) encountering a footling breech birth, 
i.e
., where a single foot or leg of the baby is already emerging from the vagina, is to transport the patient immediately to a hospital.  
Accordingly, Dr. Aguilera told Carola Neville, the certified emergency communications registered nurse (ECRN) answering the telemetry phone, to order the paramedics to transport plaintiff to the hospital
.  Estimated time to arrive at St. Francis Hospital was approximately four to five minutes.  

Thinking that an obstetrical emergency case was being brought in, Dr. Aguilera called the obstetrical (OB) department and requested that an OB
 resident come to the emergency department to assist with the case.  Dr. Kloempken, a second-year OB resident and the OB resident on call that day, responded to the request.  She ordered that a labor and delivery room be opened and then went down to the emergency department to meet the arriving ambulance.  

At 2:56 p.m., approximately seven minutes after their first call,
 the paramedics again called for instructions.  They had not begun transport to the hospital because the baby started to emerge further
 and was now protruding with both legs and buttocks from plaintiff's vagina.  When Dr. Kloempken 
arrived in the emergency room, Dr. Aguilera told her to provide instructions to the paramedics over the telemetry phone
(footnote: 1).   Dr. Kloempken thought that the paramedics were already in transit to the hospital and 
directed them to attempt to manually rotate the baby.  The paramedics informed Dr. Kloempken that the baby had no pulse and that plaintiff was not having contractions and that they were going to try to get plaintiff out of the second-story bathroom where she was lying on the floor and bring her to the hospital.  
Dr. Kloempken told them to stay where they were and to continue to rotate the baby and try to deliver it. 

Fifteen minutes after the start of the second call, the baby's head had still not delivered and Dr. Aguilera ordered immediate transport of plaintiff and emergent baby to the hospital.  At 3:14 p.m., as plaintiff was being placed on a stretcher, the baby's head spontaneously delivered.  Baby Sabree
 arrived at the hospital at 3:22 p.m., cyanotic and without a pulse.  He was resuscitated and transferred to Children's Memorial Hospital, where he died after being taken off life support on October 10, 1996.

Plaintiff filed a three-count wrongful death action against the City of Evanston, St. Francis Hospital and Dr. Kloempken.  Count I against the 
City of Evanston was dismissed after the City of Evanston settled with plaintiff.  Count II alleged that defendants St. Francis Hospital and Dr. Kloempken, individually and as an agent of St. Francis Hospital given her status as an employee of St. Francis Hospital, engaged in gross negligence and willful and wanton misconduct.  Count III alleged that St. Francis Hospital and Dr. Kloempken, individually and as an agent of St. Francis Hospital, 
were negligent.  Plaintiff filed a motion for partial summary judgment asking the court to find, as a matter of law, that defendants were subject to liability for Dr. Kloempken's negligent acts and omissions regarding her instructions to the paramedics.  The court denied the motion.  
The court granted summary judgment to St. Francis Hospital and Dr. Kloempken on counts II and III, finding that defendants were immune from civil liability pursuant to the EMS Act and that Dr. Kloempken's conduct was not willful and wanton.  The court denied plaintiff's motion to reconsider its grant of summary judgment on the willful and wanton count.  Upon dismissal of the City of Evanston, the court made its orders regarding summary judgment final and appealable.
  Plaintiff timely appeals and argues that the court erred in granting summary judgment to defendants, denying her motion for partial summary judgment and denying her motion to reconsider.

A drastic means of disposing of litigation, a motion for summary judgment is granted only when the pleadings, depositions, and admissions on file, together with any affidavits, construed strictly against the movant and liberally in favor of the opponent of the motion, 
show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  
Purtill v. Hess
, 111 Ill. 2d 229, 240, 489 N.E.2d 867, 871 (1986).  
We review the trial court's entry of summary judgment 
de novo
.  
Axen v. Ockerlund Construction Co.
, 281 Ill. App. 3d 224, 229, 666 N.E.2d 693, 696 (1996)
.

The trial court granted summary judgment to defendants because it found them immune from civil liability pursuant to the EMS Act.  
The Illinois EMS Act establishes a scheme for coordinating and integrating all activities within the state concerning pre-hospital and inter-hospital emergency services.  210 ILCS 50/2 (West 1996).  The state is divided into geographic regions, each with a designated EMS resource hospital
 and a plan for coordinating the region's emergency medical services, trauma services, and nonemergency medical services.  
210 ILCS 50/3.15, 3.20(b) (West 1996).  
Authority and responsibility for the regional EMS system are vested in the region's resource hospital through the EMS medical director or his designee.  
210 ILCS 50/3.155(a) (West 1996). 

Section 3.150(a) of the EMS Act provides for immunity from civil liability for acts or omissions committed by 

"[a]ny person, agency or governmental body certified, licensed or authorized pursuant to this Act or rules thereunder, who in good faith provides emergency or non-emergency medical services * * * in the normal course of conducting their duties, or in an emergency, * * * unless such acts or omissions  * * * constitute willful and wanton misconduct."  210 ILCS 5/3.150(a) (West 1996).

The Act also extends immunity from civil liability to any 

"person, including any private or governmental organization or institution that administers, sponsors, authorizes, supports, finances, educates or supervises the functions of emergency medical services personnel certified, licensed or authorized pursuant to this Act, * * * for any act or omission in connection with administration, sponsorship, authorization, support, finance, education or supervision of such emergency medical services personnel, where the act or omission occurs in connection with activities within the scope of this Act, unless the act or omission was the result of willful and wanton misconduct."  
210 ILCS 50/3.150(b) (West 1996).
(footnote: 2) 

We will first address Dr. Kloempken's immunity from civil liability pursuant to the EMS Act and then consider St. Francis Hospital's immunity.
 

In 1996, St. Francis Hospital was the resource hospital for the EMS region encompassing Evanston and Dr. Glen Aldinger served as the region's EMS medical director.
  As EMS medical director, Dr. Aldinger had to "appoint an alternate EMS Medical Director 
and establish a written protocol addressing the functions to be carried out in his or her absence."  210 ILCS 50/3.35(b) (West 1996).  He also had to "[e]stablish protocols for utilizing ECRNs and physicians licensed to practice medicine in all of its branches to monitor telecommunications from, and give voice orders to, EMS personnel, under the authority of the EMS Medical Director."  210 ILCS 50/3.35(
l
) (West 1996).  T
he EMS protocols established by Dr. Aldinger at 
St. Francis Hospital provide that the only physicians authorized to monitor telecommunications with and give voice orders to EMS personnel under Dr. Aldinger's authority are emergency room physicians
.  These physicians 
have been tested on the EMS policies, SOPs and medical protocols and have been personally approved by Dr. Aldinger to serve as his designee in his absence.  

There is no question that Dr. Kloempken was not an emergency room physician, was unfamiliar with EMS protocols and SOPs, and had not been preapproved by Dr. Aldinger to give telemetry instructions as his designee.  Accordingly, plaintiff argues that Dr. Kloempken was not "
certified, licensed or authorized pursuant to this Act or rules thereunder
" to provide pre-hospital emergency services and, therefore, she could not be immune from liability pursuant to section 3.150(a).  We agree that section 3.150(a)
 does not apply to Dr. Kloempken.  

However, we find that Dr. Kloempken is immune from civil liability pursuant to section 3.150(b) of the Act.  At Dr. Aguilera's behest, she supervised the paramedics' delivery of the baby and instructed them on how to proceed.  
It is uncontested that the paramedics were certified pursuant to the Act and that delivery of a baby is within the scope of emergency medical services contemplated by the Act.  Accordingly, there is no question that Dr. Kloempken was engaged in "supervision" of "emergency medical services personnel certified, licensed or authorized pursuant to [the] Act" and her alleged misconduct occurred "in connection with activities within the scope of [the] Act."  210 ILCS 50/3.150(b) (West 1996).  As such, she is immune from civil liability unless her alleged acts or omissions were the result of willful and wanton misconduct.  210 ILCS 50/3.150(b) (West 1996)
.

A
rguably, since Dr. Kloempken was not an emergency room physician familiar with the EMS SOPs and protocols and not formally authorized to act as Dr. Aldinger's designee, she was not authorized to supervise or instruct the paramedics and the section 3.150(b) immunity provision would not apply to her.  We find, however, as a matter of law, that she was authorized to do so pursuant to the authority vested in her by Dr. Aldinger's designee, Dr. Aguilera
.  
It is uncontested 
that Dr. Aguilera, acting under Dr. Aldinger's authority, 
 was authorized
 pursuant to the EMS Act.  
210 ILCS 50/3.35(
l
) (West 1996).  
When the paramedics' call came in, Dr. Aguilera
 w
as the emergency room physician on duty.  As such, pursuant to the hospital's protocols, he served as the EMS medical director designee because Dr. Aldinger was out of town.  He was 
responsible for medical control, for pre-hospital emergency care and
 communications,
 and for deciding whether to proceed with delivery.  

Dr. Aguilera
 
was 
intimately familiar with EMS protocols and SOPs
 because he served as St. Francis Hospital's 
EMS alternate medical director for several years.  H
e 
knew the paramedics responding to plaintiff's emergency call because he had trained them and worked with them on an ongoing basis.  He testified that he trusted their ability to assess the situation and provide a clear picture of what was happening and knew that they were very capable of following directions and delivering the baby.  He knew Dr. Kloempken's level of expertise because she was frequently called to evaluate obstetrical or gynecological cases in the emergency department and he felt she was capable of instructing the paramedics.  Based on this knowledge and the emergent circumstances, 
he decided to proceed with delivery and that Dr. Kloempken was best qualified to instruct the paramedics.
 

Drs. Aguilera, Aldinger and Kloempken all testified that Dr. Kloempken acted under Dr. Aguilera's control and with his authorization during the telemetry call.  Drs. Aldinger and Aguilera testified that Dr. Kloempken could not have used the EMS telemetry phone without Dr. Aguilera's approval and that she was at all times under his supervision as the EMS medical director designee.  After telling Dr. Kloempken to instruct the paramedics on delivery, Dr. Aguilera did not speak to the paramedics until he gave the second order to transport immediately.  He observed the communications, allowed Dr. Kloempken to give orders in his presence and agreed with her orders.  Drs. Kloempken and Aguilera both stated that they were communicating with each other throughout the telemetry call and were constantly assessing whether to continue with delivery or attempt transport, and that the ultimate decision to proceed with delivery or transport was Dr. Aguilera's.    

 
Dr. Aldinger testified that Dr. Kloempken was not a physician who was part of the EMS system at St. Francis Hospital because she had not signed off on her knowledge of the SOPs and protocols.  However, Dr. Aldinger also testified that
, if a patient is experiencing difficulties in active delivery, the most experienced person should be utilized to facilitate the best possible delivery as it is occurring, even in the field.  OB residents would routinely be called down to the emergency room for obstetrical emergencies because all emergency room physicians, including himself, deferred to specialists in obstetrics and gynecology for virtually every aspect of obstetrical care post 20 weeks.  Any resident called into the emergency room on consultation was supervised by an emergency room physician unless accompanied by an attending physician of her own specialty.  Dr. Aldinger testified that it was therefore proper to let Dr. Kloempken instruct the paramedics and that Dr. Aguilera's supervision, direction and control satisfied all EMS policies and procedures with respect to the qualifications of a physician communicating with paramedics in the field.     

Dr. Aldinger's testimony makes clear that Dr. Aguilera was acting under Dr. Aldinger's authority as medical director when he ordered Dr. Kloempken to give instructions to the paramedics and that his decision was proper.  
The Act provides that all advanced, intermediate and basic life support services are to "be initiated as authorized by the EMS Medical Director" in an EMS system approved by the Illinois Department of Public Health, "under the written or verbal direction of a physician licensed to practice medicine in all of its branches or under the verbal direction of an Emergency Communications Registered Nurse."  210 ILCS 50/3.10(a), (b), (c) (West 1996).  In this case, acting under the auspices of the medical director and his chosen designee,
 Dr. Kloempken was that physician. 
 Given the emergent circumstances and Dr. Aguilera's authority as the EMS medical director designee, we find it was entirely appropriate and within EMS guidelines for him to direct Dr. Kloempken to instruct on the radio call as his authorized representative.  

There is no question of fact on this issue.  Plaintiff's medical expert, Dr. Jeffrey Wener, acknowledged that he is an obstetrical and gynecological expert rather than an expert on emergency room medicine or EMS systems and that he would rely on Dr. Aldinger's testimony regarding the proper policies and procedures of the St. Francis Hospital EMS system.  Dr. Aldinger testified that both Drs. Kloempken and Aguilera acted within the St. Francis EMS SOPs and protocols.  Accordingly, we find on these facts that Dr. Kloempken was authorized to provide instruction and supervision to the paramedics under the EMS Act pursuant to Dr. Aldinger's authority as EMS medical director and that immunity provision section 3.150(b) would apply to her. 

Having found that Dr. Kloempken was authorized to act pursuant to the EMS Act, we must now determine whether her alleged omissions and errors in directing the paramedics rise to the level of "willful and wanton misconduct" such that immunity is lost.  Willful and wanton acts show "actual or deliberate intent to harm" or, if not intentional, show "an utter indifference to or conscious disregard for a person's own safety or the safety or property of others."  
Pfister v. Shusta
, 167 Ill. 2d 417, 421, 657 N.E.2d 1013, 1016 (1995), citing 
Ziarko v. Soo Line R.R. Co.
, 161 Ill. 2d 267, 273, 641 N.E.2d 402, 405 (1994); see also Illinois Pattern Jury Instructions, Civil, No. 14.01 (1995) (instruction on unintentional willful and wanton misconduct defined as "a course of action which shows an utter indifference to or conscious disregard for a person's own safety").  Our supreme court has further defined willful and wanton acts as follows:  

" ' "A wilful or wanton injury must have been intentional or 
the act must have been committed under circumstances exhibiting a reckless disregard for the safety of others
, such as a failure, after knowledge of impending danger, to exercise ordinary care to prevent it or a failure to discover the danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care." ' " (Emphasis added) 
American National Bank & Trust Co. v. City of Chicago
, 192 Ill. 2d 274, 285, 735 N.E.2d 551, 557 (2000), quoting 
Ziarko
, 161 Ill.2d at 273, 641 N.E.2d at 405, quoting 
Schneiderman v. Interstate Transit Lines, Inc.
, 394 Ill. 569, 583, 69 N.E.2d 293, 300 (1946).

Plaintiff has not alleged that Dr. Kloempken intentionally harmed plaintiff or her baby.  Rather, plaintiff argues that genuine issues of material fact exist regarding whether Dr. Kloempken acted with conscious disregard for the well-being of the baby.  Plaintiff asserts that Dr. Kloempken showed her reckless disregard for plaintiff and her baby's welfare when she (a) failed to immediately order the paramedics to transport plaintiff to the hospital in accordance with the paramedics' training and St. Francis Hospital EMS standard operating procedures regarding a limb presentation encountered in the field; (b) failed to determine the baby's orientation in the cervix/vagina
, especially whether the lower halves of the baby's scapulas had been delivered, in contravention of an authoritative text on delivery of breech and limb presentation births; and (c) ordered the paramedics to "pull" the baby out in contravention of St. Francis Hospital's SOPs.  

Although we have found no cases concerning a physician's alleged willful and wanton misconduct in providing telemetry instructions to emergency personnel, cases involving alleged willful and wanton misconduct by emergency personnel are helpful in determining whether Dr. Kloempken's conduct was willful and wanton.  Deviations from established guidelines and instructions on how to respond to an emergency call have been found sufficient to create a question for the trier of fact to determine whether a defendant's conduct was willful and wanton.  
American National Bank & Trust Co.
, 192 Ill. 2d at 286, 735 N.E.2d at 558 (paramedics' conduct found willful and wanton where, in violation of basic training precept to always try door before leaving scene of emergency call, paramedics left scene without trying unlocked apartment door when they received no response to their knocking and asthma victim in apartment died).  However, where the providers of emergency services provided extensive care and followed SOPs, courts have found that there was no willful and wanton misconduct despite a bad outcome for the patient.  See 
Brock v. Anderson Road Ass'n
, 287 Ill. App. 3d 16, 677 N.E.2d 985 (1997) (paramedics' failure to diagnose heat-related illness due to their unfamiliarity with thermometer was not willful and wanton misconduct given the extensive care provided to decedent in conformity with SOPs); 
Bowden v. Cary Fire Protection District
, 304 Ill. App. 3d 274, 710 N.E.2d 548 (1999) (EMTs' difficulty in providing oxygen to decedent was not willful and wanton misconduct given the extensive care provided to decedent in conformity with SOPs).  Such is the case here since Dr. Kloempken did not violate the SOPs, instructions or guidelines raised by plaintiff.

When faced with a single-limb presentation in the field, the paramedics' training and the St. Francis Hospital SOPs dictate an immediate transport of the expectant mother to the hospital.  However, the situation encountered by Dr. Kloempken did not concern a single-limb presentation.  Rather, by the time Dr. Kloempken was handed the phone, the baby had already emerged as far as its buttocks, indicating that active delivery had commenced
(footnote: 3).  In addition, the record shows that the paramedics' SOPs are standing orders to be followed in the absence of communication with medical control
(footnote: 4) and may be deviated from under medical supervision.  Therefore, even if the paramedics were not trained to deliver a breech baby, they could do so under instructions from medical control.  As Dr. Aldinger stated, the EMT guidelines that he was shown did not contemplate the situation where the EMTs were in contact with a medical expert.  Dr. Aguilera, who was very familiar with the paramedics' training and abilities, considered the paramedics able to deliver the baby and, therefore, Dr. Kloempken proceeded with her instructions under his supervision.  Further, Dr. Aldinger testified that Dr. Kloempken's actions and instructions were appropriate and within the EMS protocols and guidelines that he had promulgated as director of the EMS program.  Accordingly, there is no question that Dr. Kloempken did not violate the paramedics' training and SOPs by not ordering immediate transport for this emergent double footling breech birth. 

With regard to the baby's orientation in the womb, it is uncontested that this determination is crucial to any successful delivery.  However, the telemetry call shows that Dr. Kloempken did attempt to ascertain the baby's position and to orient the baby in the best possible position for delivery.  She instructed the paramedics several times to rotate the baby so that its "butt" was facing up and its legs and abdomen were facing down, getting constant feedback from the paramedics on the baby's position and their progress with the rotation and delivery.  Although plaintiff argues that no attempt to deliver a breech baby's arms and shoulders should be made until the baby's scapula's or armpits are visible, it is clear that Dr. Kloempken did not attempt to do this.  She constantly asked the paramedics whether they could see the shoulders yet and, when they could, instructed the paramedics to gently rotate the baby to the right to deliver his right arm and then to the left to deliver his other arm.  The transcript of the telemetry call verifies Dr. Kloempken's assertion that, since she was not at the scene, she was doing her best with the paramedics so that they would be "on the same wavelength to describe the position of the baby."  There is no question of fact on this issue.

Lastly, contrary to plaintiff's assertions, Dr. Kloempken did not instruct the paramedics to "pull" the baby out in contravention of the paramedics' SOPs which specifically state that paramedics should "never attempt to pull the infant from the vagina by the legs or trunk."  The transcript of the telemetry call shows that Dr. Kloempken never told the paramedics to pull the baby out by its legs or trunk.  Rather, she consistently told the paramedics to "guide" or "gently guide" the baby out, repeating this instruction in excess of 10 times.  Dr. Kloempken thrice instructed the paramedics to put one hand on the baby's hips and the other hand on the baby's "butt and guide the kid out."  Only when the paramedic asked, "Just pull him out?" in response to the third repetition of the instruction did Dr. Kloempken respond, "Pull him out."  The paramedic relaying the instructions can be heard telling the delivering paramedic "she says just to try and guide the kid out."  Later in the call, he informed Dr. Kloempken several times that they were trying to guide the baby out and that they were trying to "gently, you know, pull out and trying to rotate to the right like you told us."  The oft-repeated instruction to guide the baby out shows that Dr. Kloempken clearly did not intend that the paramedics pull the baby out by force, let alone by tugging on its legs and trunk, and the paramedics' response shows that they understood that this is not what they were being told to do.  Accordingly, we find that Dr. Kloempken did not violate the paramedics' and St. Francis Hospital's SOPs or the established guidelines for breech delivery.

The record shows that Dr. Kloempken clearly made a good-faith effort to save plaintiff's baby and did not recklessly or consciously disregard the well-being and safety of plaintiff or her baby.  Dr. Kloempken provided extensive instruction to the paramedics on how to deliver the baby and her actions do not exhibit an utter indifference to the baby or plaintiff's safety.  As Dr. Kloempken testified, she knew that the baby's legs were already out of plaintiff's vagina and that his buttocks had transversed the cervix, indicating that the cervix was probably fully dilated and that plaintiff was actively delivering the baby.  Shortly thereafter, she learned that plaintiff was in a second-story bathroom from which movement to a stretcher and transport through the living room and down the stairs to the ambulance for transport to the hospital would be difficult.  As Dr. Kloempken stated, "During each step of the way, I considered whether it was best to bring this infant in.  However, when the infant is in the process of being delivered, whether it's a breech or vaginally, it's best to proceed with the delivery and most expeditious to proceed with the delivery."  Dr. Kloempken testified that, rather than risk a dangerous and potentially time consuming transport to the hospital, she determined that the best course was to continue to deliver the baby in the field despite the difficulty involved in a breech delivery.  Any omissions or errors by Dr. Kloempken were clearly not committed under circumstances exhibiting a reckless disregard for the safety of others given the urgency of the situation and her conduct did not rise to the level of willful and wanton misconduct.  Accordingly, under the facts of this case, because Dr. Kloempken was authorized to provide emergency instructions to and supervision of the paramedics under the Act and because her acts did not rise to the level of willful and wanton misconduct, she is immune from civil liability pursuant to section 3.150(b) of the EMS Act, both individually and as an agent of St. Francis Hospital.  Whether Dr. Kloempken's instructions to the paramedics were
 negligently given is moot because she is immune from civil liability pursuant to the EMS Act.  See 
Tornabene v. Paramedic Services of Illinois, Inc.
, 314 Ill. App. 3d 494, 501, 731 N.E.2d 965, 971 (2000). 

St. Francis Hospital is also immune from civil liability pursuant to section 3.150(b) of the EMS Act.  A
s 
the designated EMS resource hospital for the region, St. Francis Hospital coordinates, monitors and supervises the regional EMS system (210 ILCS 50/3.35 (West 1996)) and neither it nor, as previously discussed, its agent, Dr. Kloempken, engaged in willful and wanton misconduct.  Dr. Aguilera's decision to put Dr. Kloempken in charge of telemetry instructions to the paramedics, despite the fact that she was not formally certified, licensed or authorized pursuant to the EMS Act, was clearly done in the best interests of the baby and not, as plaintiff asserts, with reckless disregard for the safety of plaintiff and her baby.  As Drs. Aldinger and Aguilera testified, when a delivery is beyond the expertise of the attending emergency room physician, it is common to call an OB resident to assist.  There is no question that this delivery was an extremely difficult one and that Dr. Aguilera considered that an OB resident would be better equipped to deal with this emergency birth than he would himself.  Although the delivery here was not occurring in the hospital, the need for assistance from an OB resident was the same as if plaintiff had been brought to the emergency room.  Therefore, rather than performing the delivery herself as she had expected, Dr. Kloempken was forced to perform it via intermediaries by supervising the paramedics, who Dr. Aguilera judged well able to perform it.  

The uncontested fact remains that Dr. Aguilera considered Dr. Kloempken better qualified than himself to direct the delivery and the paramedics capable of following instructions and doing the delivery.  Therefore, in his capacity as EMS medical director designee, he chose to put an OB resident untrained in EMS procedures on the telemetry call.  His decision, although allegedly made in contravention of St. Francis Hospital's protocols requiring that only trained personnel man the telemetry phone, was clearly made with the full authority of Dr. Aguilera's position as the designated medical director responsible for supervising the regional EMS system.  It was in the baby's best interest that the best qualified doctor direct the delivery, regardless of whether that doctor was EMS certified, licensed or authorized.  Moreover, Dr. Aldinger testified that Dr. Aguilera properly allowed Dr. Kloempken to instruct the paramedics and that his supervision, direction and control satisfied all EMS policies and procedures with respect to the qualifications of a physician communicating with paramedics in the field. Accordingly, Dr. Aguilera's decision and St. Francis Hospital's alleged acquiescence therein do not reflect the requisite level of conscious disregard for or utter indifference to the safety of the baby to be termed willful and wanton misconduct such that immunity pursuant to the EMS Act is lost.  On the facts of this case, the trial court properly granted defendants' motion for summary judgment on the willful and wanton misconduct and negligence counts and properly denied plaintiff's motion for partial summary judgment that defendants were subject to liability for Dr. Kloempken's negligent acts and omissions regarding her instructions to the paramedics.

In her answers to defendants' Rule 213 (177 Ill. 2d R. 213) interrogatories, plaintiff disclosed that her medical expert, Dr. Wener, would opine that "St. Francis Hospital, through its employee physician, Therese Kloempken, M.D. acted in conscious disregard of the safety and well being" of the baby by "grossly deviating from the standard of care for physicians providing obstetrical and emergency care" existing in the Evanston area in October 1996 by not ordering immediate transport of plaintiff and baby, by prohibiting the paramedics from removing and transporting them, by failing to ascertain vital information regarding the position of mother and child before instructing the paramedics to rotate and attempt to deliver the baby, and by instructing the paramedics in improper and contraindicated delivery techniques by telling them to pull on the baby.  In her motion to reconsider the grant of summary judgment on the willful and wanton count, plaintiff cited Dr. Wener's opinion as evidence of defendants' willful and wanton misconduct.  The trial court denied the motion, finding that Dr. Wener's opinion that defendants acted with conscious disregard for the baby's safety was a conclusion of law unsupported by the factual instances Dr. Wener discussed in his discovery deposition because they did not rise to the level of conscious disregard. 

The trial court must consider depositions
 and answers to interrogatories in determining a motion for summary judgment.  
Hernandez v. Trimarc Corp.
, 38 
Ill. App. 3d
 1004, 1007, 350 
N.E.2d
 202, 205 (1976); 
Komater v. Kenton Court Associates
, 151 
Ill. App. 3d
 632, 637, 502 
N.E.2d
 1295, 1298 (1986).  However, as the trial court noted
, 
Dr. Wener's opinion 
that defendants acted in conscious disregard of the safety and well-being of the baby
 is a conclusion of law.   A conclusion of law is for the 
trial court to determine based upon the legal effect of the facts adduced.  
Charter Bank & Trust of Illinois v. Edward Hines Lumber Co.
, 233 Ill. App. 3d 574, 579, 
599 N.E.2d 458, 462 (1992).  
Construing the evidence 
strictly against defendants, w
e agree with the trial court that the opinions stated by Dr. Wener and his bases therefore do not rise to the level of conscious disregard for the safety and well-being of the baby. 

The instances cited by Dr. Wener as the basis for his conclusion that defendants acted 
in conscious disregard of the baby's safety concern the same issues we have disposed of above: Dr. Kloempken's failure to order immediate transport, her alleged failure to determine the position of the baby, her alleged order to the paramedics to pull the baby out, and Dr. Aguilera's decision to allow Dr. Kloempken to instruct the paramedics; none of which rise to the level of willful and wanton misconduct.  Moreover, as stated previously, Dr. Wener stated that he would rely on Dr. Aldinger's testimony regarding the proper policies and procedures of the St. Francis Hospital EMS system and Dr. Aldinger testified that both Drs. Kloempken and Aguilera acted within the St. Francis EMS SOPs and protocols. 

In his discovery deposition, Dr. Wener stated that Dr. Kloempken, "knowing what residents should know at her level of training and knowing what is appropriate under an emergency situation like there was in this particular case," was "educated enough to know that to give the very best care, provide the very best care for this mother and fetus, that that is to tell them to get to the hospital as soon as possible and not to sit on the phone and try to teach paramedics how to deliver a very complicated delivery" and that "her actions fell far far below the applicable standards under that situation."  He explained that, under the circumstances, no one was qualified to give information on delivering this baby, no physician should have been instructing the paramedics on delivering this breech baby in the field, and Dr. Kloempken should have declined to assist with the instructions.  However, his statements do not provide evidence that Dr. Kloempken consciously disregarded the safety of the baby.  Rather, Dr. Wener's indictment of Dr. Kloempken's actions would tend to support his other opinion that defendants were negligent.   

The only deposition reference that Dr. Wener makes to any alleged disregard by Dr. Kloempken, besides his adoption of the opinions noted in the Rule 213 interrogatory answer, is his statement that it "is in complete disregard to any textbook, any authority that's written on delivering a breech baby" to "pull on that baby."  Dr. Wener's statement was made with regard to his observation that "Dr. Kloempken on a number of occasions said get that kid out, pull that baby out."  As previously discussed, the transcript of the telemetry call shows that Dr. Kloempken consistently instructed the paramedics to guide or gently guide the baby out of the vagina and did not intend that they pull on the baby.  The paramedics' responses show that they understood the instruction as it was intended and tried to guide the baby out.  Accordingly, the court correctly denied plaintiff's motion to reconsider the court's decision regarding the willful and wanton count. 

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

THEIS, P.J., and HARTMAN, J., concur.

FOOTNOTES
1:  Dr. Kloempken could not recall whether Dr. Aguilera told her to give instructions or how she got the phone.  However, Dr. Aguilera testified that he told Dr. Kloempken to provide the instructions to the paramedics and Neville, the ECRN, testified that Dr. Aguilera told her to put Dr. Kloempken on the telemetry phone.  Neville testified that, unless given permission, no one except emergency room physicians and ECRNs are permitted to talk on the telemetry phone.

2:  
The EMS Act notes that "[e]xemption from civil liability for emergency care is as provided in the Good Samaritan Act [(745 ILCS 49/1 
et seq
. (West 1996))]."  210 ILCS 50/3.150(c) (West 1996).
  However, because this paragraph of the EMS Act did not become effective until January 1, 1997, after the incident at issue here, we need not  consider it.

3:  Several sources in the record indicate that, in the case of a single-limb presentation, active delivery has likely not begun.

4:  Medical control is comprised of the nurses or physicians in radio contact with rescue personnel.