# Illinois Official Reports

## Appellate Court

---

### *Bass v. Cook County Hospital*, 2015 IL App (1st) 142665

---

| | |
|---|---|
| Appellate Court Caption | DENISE BASS, Individually and as Independent Administrator of the Estate of Donail Weems, Deceased, Plaintiff-Appellee, v. COOK COUNTY HOSPITAL, d/b/a Provident Hospital, Defendant (University of Chicago Hospital, Defendant-Appellant). |
| District & No. | First District, Sixth Division<br>Docket No. 1-14-2665 |
| Filed | March 20, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-L-14343; the Hon. Moira S. Johnson, Judge, presiding. |
| Judgment | Certified question answered; cause remanded. |
| Counsel on Appeal | Mark M. Brennan, Blair R. Kipnis, and Anthony J. Longo, all of Cassiday Schade LLP, of Chicago, for appellant.<br><br>Ryan E. Yagoda and Constance M. Dukes, both of Kralovec, Jambois & Schwartz, of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE HOFFMAN delivered the judgment of the court, with opinion.<br>Justices Hall and Rochford concurred in the judgment and opinion. |

**OPINION**

¶ 1     The plaintiff, Denise Bass, individually and as independent administrator of the estate of Donail Weems, deceased,[1] filed a medical malpractice action against the defendants, Cook County Hospital, d/b/a Provident Hospital (Provident), and the University of Chicago Hospital (UCH), alleging that 11-year-old Donail received negligent emergency medical treatment on September 3, 2006. UCH filed a motion for summary judgment, pursuant to section 2-1005 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1005 (West 2012)), asserting civil immunity from the plaintiff's allegations under section 3.150 of the Emergency Medical Services (EMS) Systems Act (Act) (210 ILCS 50/3.150 (West 2012)). On July 23, 2014, the circuit court denied UCH's motion, but it certified one question, pursuant to Illinois Supreme Court Rule 308 (eff. Feb. 26, 2010), for our review:

> "Whether a defendant hospital is immune from vicarious liability under the Emergency Medical Services Systems Act for the allegedly negligent medical services rendered by its certified flight physician after he arrives at the transferring hospital, assumes care, and transports the patient to another hospital."

¶ 2     UCH timely filed an application for leave to appeal under Rule 308, which we granted on September 24, 2014. For the reasons that follow, we answer the certified question in the affirmative.

¶ 3     For purposes of context, we briefly discuss the general provisions of the Act. The Act has been described as a "comprehensive, omnibus source of rules governing the planning, delivery, evaluation, and regulation of emergency medical services." *Abruzzo v. City of Park Ridge*, 231 Ill. 2d 324, 341 (2008). The purpose of the Act is to provide "minimum standards for the statewide delivery of" emergency services, recognizing that "diversities exist between different areas of the State, based on geography, location of health care facilities, availability of personnel, and financial resources." 210 ILCS 50/2 (West 2012).

¶ 4     In order to fulfill the stated purpose, the Act provides that the Department of Public Health (Department) shall designate emergency medical services (EMS) regions (210 ILCS 50/3.15 (West 2012)) and oversee each region's "EMS System" (210 ILCS 50/3.20 (West 2012)). An EMS System is defined as "an organization of hospitals, vehicle service providers and personnel approved by the Department in a specific geographic region." 210 ILCS 50/3.20(a) (West 2012). The entities within an EMS System coordinate and provide services pursuant to a plan submitted to and approved by the Department. *Id.* Each system must have a "resource hospital," and that hospital is required to create its region's EMS System plan, appoint an EMS medical director, administer and oversee its plan, and educate the participants regarding plan protocols. 210 ILCS 50/3.35 (West 2012). All other hospitals within the designated region which have "standby, basic or comprehensive level emergency departments" function in their EMS System as either an "Associate Hospital" or "Participating Hospital." 210 ILCS 50/3.20(b) (West 2012). Associate or participating hospitals must "follow all System policies specified in the System Program Plan." *Id.*

---

[1]Initially, Bass sued as mother and next friend of Donail, a minor. However, Donail died during the pendency of this litigation, and on January 27, 2014, Bass filed a second amended complaint reflecting this fact and substituting her position as the administrator of Donail's estate.

¶ 5    The EMS System plan is required to address protocols for patient transports, disaster preparedness plan, and other scenarios that arise during emergencies, such as the handling of "Do Not Resuscitate" instructions. 210 ILCS 50/3.30 (West 2012). The scope of services encompassed by the Act includes advanced, intermediate, and basic life support services, first-response services, prehospital care, interhospital care, and critical care transport. 210 ILCS 50/3.10 (West 2012) (defining each type of service).

¶ 6    In this case, UCH served as one of four designated resource hospitals in Chicago, and Provident was a participating hospital within UCH's EMS System plan. UCH's Aeromedical Network (UCAN) participates in the EMS System plan as UCH's medical transport service for prehospital and interhospital transfers of patients to and between hospitals. See 210 ILCS 50/3.20(b) (West 2012) (stating that all hospitals and vehicle service providers participating in an EMS System must specify their level of participation). Dr. Eric Beck, a UCH physician, served as the EMS medical director for this region and was responsible for administering the EMS System plan approved by the Department. As the EMS medical director, Dr. Beck was authorized by the Act to designate other physicians to administer the plan in his absence. See 210 ILCS 50/3.35(b) (West 2012). Dr. Ira Blumen, a UCH emergency room physician, was the physician designated by Dr. Beck to administer the plan in his absence on September 3, 2006, the date of Donail's emergency interhospital transfer.

¶ 7    The undisputed facts establish that Donail began to have breathing difficulties on the evening of September 2, 2006. Pursuant to a previous diagnosis of asthma in 2003, Bass and Donail were instructed to use an albuterol inhaler and nebulizer to treat Donail's symptoms as needed. On that night, after Donail's albuterol inhaler and nebulizer treatments failed to help him, Bass called an ambulance. Donail was taken to Provident Hospital, where he was treated in the emergency room by Dr. Linda Lynch and resident physician, Dr. Michael Hohlastos. At approximately 6:45 a.m. on the morning of September 3, 2006, Donail was intubated and connected to a mechanical ventilator, and his physicians determined that he needed to be transferred to the nearest hospital with a pediatric intensive care unit (PICU).

¶ 8    At approximately 7:20 a.m. on that morning, Dr. Hohlastos contacted Provident's resource hospital, UCH, to request an emergency transport for Donail to UCH's PICU. Dr. Norma Lopez-Molina, a UCH PICU physician, received the call from Dr. Hohlastos and contacted UCAN to request the emergency transfer. Dr. Blumen, in his capacity as acting EMS medical director, authorized the transfer and directed Dr. Nicholas Strane, a UCH emergency room resident physician and UCAN certified flight physician, to assist in the transport. Dr. Strane was also authorized under the EMS System plan as an "Emergency Communications Physician."

¶ 9    After receiving Dr. Blumen's order, Dr. Strane and certified flight registered nurse Therese Campbell[2] rode in the UCAN-ambulance to pick up Donail at Provident. They arrived at approximately 8:27 a.m. Dr. Strane assessed Donail's condition, determining that he was in respiratory distress, extremely tachycardic, sedated, intubated, and unresponsive. The EMS team took Donail off the mechanical ventilator and placed him on a manual bag ventilator. Donail was transferred onto a gurney and into the ambulance. The ambulance left Provident at 8:48 a.m., with Dr. Strane and nurse Campbell taking turns operating Donail's manual bag ventilator.

---

[2]Nurse Campbell's conduct is not at issue in this case.

¶ 10 At 9:07 a.m., the ambulance arrived at UCH, and the EMS team accompanied Donail to the PICU. On the way to the PICU, Donail became severely bradycardic and required chest compressions on two occasions to improve his circulation. The EMS team arrived in the PICU at 9:09 a.m. at which time Donail went into cardiac arrest. At that same time, Dr. Strane and nurse Campbell released Donail to the care of the attending UCH PICU physicians and nurses and that team revived him. However, Donail sustained an anoxic brain injury and subsequently died on July 12, 2013.

¶ 11 On December 30, 2008, Bass filed a medical malpractice action against Provident. On June 18, 2012, she filed an amended complaint adding UCH as a defendant, alleging, in relevant part, that UCH was vicariously liable for Dr. Strane's negligence in failing to: manage and treat Donail's abnormally high pCO2 levels prior to his transfer; perform aggressive asthma management and treatment prior to his transfer; address Donail's worsening respiratory failure prior to his transfer; recognize the improper paralytics administered in the emergency room prior to transfer; and provide proper ventilator management prior to and during the transfer.

¶ 12 After extensive discovery, UCH moved for summary judgment on May 5, 2014, arguing that the civil immunity provided by section 3.150 of the Act (210 ILCS 50/3.150 (West 2012)) applied to the medical treatment provided by Dr. Strane to Donail during the emergency interhospital transport. Therefore, UCH contended that it was also immune from liability as Dr. Strane's employer. On July 23, 2014, the circuit court denied UCH's motion, acknowledging that another circuit court in Cook County had issued an opposite decision in a case involving similar facts.

¶ 13 As noted, this appeal comes to us in the form of a certified question pursuant to Rule 308, and the resolution of that question requires us to interpret section 3.150 of the Act. The fundamental principle of statutory construction is to ascertain and give effect to the legislature's intent. *Illinois Department of Financial & Professional Regulation v. Rodriquez*, 2012 IL 113706, ¶ 13. The language of the statute is the most reliable indicator of the legislature's objectives in enacting a particular law, and we give statutory language its plain and ordinary meaning. *Id.* Where the language of a statute is clear and unambiguous, we must apply it without resort to further aids of statutory construction. *Id.* Moreover, "[w]e must not depart from the plain language of the Act by reading into it exceptions, limitations, or conditions that conflict with the express legislative intent." *Town & Country Utilities, Inc. v. Illinois Pollution Control Board*, 225 Ill. 2d 103, 117 (2007). Finally, "words and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute." *Id.* Questions of law, such as those involving statutory construction, are reviewed *de novo*. *O'Casek v. Children's Home & Aid Society of Illinois*, 229 Ill. 2d 421, 440 (2008).

¶ 14 UCH contends that the treatment rendered by Dr. Strane falls under the immunity provisions provided by section 3.150(a) of the Act, which states:

"(a) Any person, agency or governmental body certified, licensed or authorized pursuant to this Act or rules thereunder, who in good faith provides emergency or non-emergency medical services during a Department approved training course, in the normal course of conducting their duties, or in an emergency, shall not be civilly liable as a result of their acts or omissions in providing such services unless such acts or omissions, including the bypassing of nearby hospitals or medical facilities in

accordance with the protocols developed pursuant to this Act, constitute willful and wanton misconduct." 210 ILCS 50/3.150(a) (West 2012).

¶ 15     According to UCH, Dr. Strane fits each requirement for immunity under section 3.150(a), including that he: (1) is a person licensed or authorized pursuant to the Act or rules thereunder; and (2) provided emergency medical services (3) in the normal course of conducting his duties. Because Dr. Strane is immune under this section of the Act, UCH maintains it is also immune as his employer under the doctrine of *respondeat superior.* Bass counter-argues that the Act was not intended to provide civil immunity for all emergency physicians, but only to the types of EMS personnel clearly defined within it.

¶ 16     We agree with Bass that the Act defines and sets forth the licensing requirements for various types of EMS personnel. See 210 ILCS 50/3.50 (West 2012) ("Emergency Medical Technician"); 210 ILCS 50/3.60 (West 2012) ("First Responder"); 210 ILCS 50/3.65 (West 2012) ("EMS Lead Instructor"); 210 ILCS 50/3.70 (West 2012) ("Emergency Medical Dispatcher"); 210 ILCS 50/3.75 (West 2012) ("Trauma Nurse Specialist (TNS) Certification"); 210 ILCS 50/3.80 (West 2012) ("Pre-Hospital RN and Emergency Communications Registered Nurse"); 210 ILCS 50/3.85 (West 2012) ("Vehicle Service Providers"); 210 ILCS 50/3.86 (West 2012) ("Stretcher van providers"). While Dr. Beck averred in his affidavit that Dr. Strane "was licensed to be part of the EMS System as an Emergency Communications Physician (ECP)," the Act does not provide a definition or licensing requirements for an "Emergency Communications Physician." However, we disagree with Bass's position that this fact establishes that the Act did not intend to provide civil immunity for Dr. Strane in the case at bar.

¶ 17     Section 3.150(a) does not limit its protection only to those "licensed" pursuant to the Act as it states that "[a]ny person *** certified, licensed *or authorized* pursuant to this Act or rules thereunder *** shall not be civilly liable as a result of [his] acts or omissions in providing" emergency services in the normal course of conducting his duties. (Emphasis added.) 210 ILCS 50/3.150(a) (West 2012). "Authorize" is defined as: "to endorse, empower, justify, or permit by or as if by some recognized or proper authority"; "to furnish grounds for"; "to give legality or effective force to (a power, instrument, order)"; "to endow with authority or effective legal power, warrant, or right." Webster's Third New International Dictionary 146 (3d ed. 1986). Applying the plain meaning of "authorize" to the Act's language, we find that, while Dr. Strane may not have been "licensed" pursuant to the Act, he certainly was "authorized" by it to participate in Donail's interhospital emergency transport.

¶ 18     It is not disputed that Dr. Beck had designated Dr. Blumen to act as EMS medical director and that, on September 3, 2006, Dr. Blumen granted the request of a participant hospital to provide an emergency interhospital transport for Donail, pursuant to the regional EMS System plan. As part of the responsibilities of a resource hospital and EMS medical director, UCH and Dr. Blumen were required to:

"Utilize levels of personnel required by the Department to provide emergency care to the sick and injured at the scene of an emergency, during transport to a hospital or during inter-hospital transport and within the hospital emergency department until the responsibility for the care of the patient is assumed by the medical personnel of a hospital emergency department or other facility within the hospital to which the patient is first delivered by System personnel." 210 ILCS 50/3.35(n) (West 2012).

¶ 19     Specifically, for critical care transports, the Act states:

"When medically indicated for a patient, as determined by a physician licensed to practice medicine in all of its branches, an advanced practice nurse, or a physician's assistant, in compliance with subsections (b) and (c) of Section 3.155 of this Act, critical care transport may be provided by:

(1) Department-approved critical care transport providers, not owned or operated by a hospital, utilizing EMT-paramedics with additional training, nurses, or other qualified health professionals; or

(2) Hospitals, when utilizing any vehicle service provider or any hospital-owned or operated vehicle service provider." 210 ILCS 50/3.10(f-5) (West 2012).

¶ 20    In reading sections 3.35(n) and 3.10(f-5), it is clear that the Act contemplated that medical personnel with expertise beyond the scope of that of emergency medical technicians (EMT) and paramedics, including physicians, will be called upon when executing EMS System plans for transporting critically ill patients, such as Donail. As further evidence thereof, Dr. Strane was trained in the EMS System plan and authorized to participate as an ECP and in transports of critically ill patients. We agree with UCH that, when Dr. Blumen assigned Dr. Strane to assist in Donail's transport, he did so using the authorities proscribed to him by the Act. Thus, Dr. Strane was also "authorized" under the Act to participate in the emergency transport of Donail.

¶ 21    In so holding, we reject Bass's argument that section 3.155 supports her position that the Act did not intend to provide immunity to emergency physicians. Section 3.155 states:

"(a) Authority and responsibility for the EMS System shall be vested in the EMS Resource Hospital, through the EMS Medical Director or his designee.

(b) For an inter-hospital emergency or non-emergency medical transport, in which the physician from the sending hospital provides the EMS personnel with written medical orders, such written medical orders cannot exceed the scope of care which the EMS personnel are authorized to render pursuant to this Act.

(c) For an inter-hospital emergency or non-emergency medical transport of a patient who requires medical care beyond the scope of care which the EMS personnel are authorized to render pursuant to this Act, *a qualified physician*, nurse, perfusionist, or respiratory therapist familiar with the scope of care needed must accompany the patient *and the transferring hospital and physician shall assume medical responsibility for that portion of the medical care*." (Emphases added.) 210 ILCS 50/3.155 (West 2012).

¶ 22    Reading this provision along with section 3.10(f-5), it is clear that, when medical care exceeding the scope of a paramedic's duties is necessary for an interhospital emergency transfer, a physician or other medical professional is required to assist. Further, the transferring hospital assumes medical responsibility for the patient during that transport. While this section makes it clear that the transferring hospital will assume *medical* responsibility for that portion of the patient's care, it is silent as to the *legal* liability for that medical care. We do not read a limitation in section 3.155 which is not present.

¶ 23    Our conclusion is supported by our supreme court's decision in *Wilkins v. Williams*, 2013 IL 114310, ¶ 20. In *Wilkins*, the supreme court determined that the Act provided immunity to an ambulance driver for a third-party negligence claim, noting that the plain language of the

Act did not limit statutory immunity only to the claims raised by patients in the ambulance. *Id.* ¶¶ 20, 22 (the court must not read an exception into a statute that does not exist). Likewise, we do not find that section 3.155's reference to "medical responsibility" creates a limitation on the immunity afforded in section 3.150(a).

¶ 24    Bass also argues that sections 3.150(c) (210 ILCS 50/3.150(c) (West 2012)) and 3.150(g) (210 ILCS 50/3.150(g) (West 2012)) establish the Act's intention to limit immunity. She asserts that, had the Act intended to provide blanket immunity, section 3.150(c), which states that "[e]xemption from civil liability for emergency care is as provided in the Good Samaritan Act [(745 ILCS 49/1 *et seq.* (West 2012))]," and section 3.150(g), which affords immunity specifically to EMS Medical Directors, would be superfluous. 210 ILCS 50/3.150(c) (West 2012). We disagree.

¶ 25    It is a general rule of construction that where a statute can be reasonably interpreted so as to give effect to all its provisions, a court will not adopt a strained reading which renders one part superfluous. *Panarese v. Hosty*, 104 Ill. App. 3d 627, 628-29 (1982). Our interpretation of section 3.150(a) as applying to Dr. Strane does not render section 3.150(c) or section 3.150(g) superfluous. Section 3.150(c) simply states that civil immunity afforded to situations involving *volunteer* medical personnel is derived through the Good Samaritan Act. In this case, it is undisputed that all medical personnel involved were acting within the scope of their employment. Further, while section 3.150(a) provides for civil immunity for those providing emergency medical services to "[a]ny person," section 3.150(g) provides immunity, not limited to medical services, for "damages in *any* civil action" for EMS Medical Directors exercising, in good faith, "his responsibilities under [the] Act." (Emphasis added.) 210 ILCS 50/3.150(a), (g) (West 2012). Accordingly, we reject Bass's contention that finding section 3.150(a) applies to Dr. Strane's conduct renders other provisions of the Act meaningless.

¶ 26    Moreover, we find that existing cases, although not directly on point with the facts of this case, have determined that physicians providing services within the scope of the Act enjoy immunity. For instance, in *Washington v. City of Evanston*, 336 Ill. App. 3d 117, 119 (2002), the plaintiff sued St. Francis Hospital and Dr. Therese Kloempken after the doctor provided verbal instructions to paramedics responding to her emergency breech-baby delivery. The attending emergency room physician, Dr. Hector Aguilera, asked Dr. Kloempken, an obstetrical resident at the hospital, to assist in directing the paramedics on what to do. *Id.* The trial court granted summary judgment in favor of the defendants on the basis that they were immune under the Act. *Id.* at 121. The appellate court determined that Dr. Kloempken was not immune under section 3.150(a) of the Act because: she was not an emergency room physician; she was unfamiliar with EMS protocols; and she had not been approved by the EMS director to participate in the EMS System plan of St. Francis Hospital, the resource hospital for its region. *Id.* at 122-23. However, the appellate court determined that Dr. Kloempken was nonetheless immune pursuant to section 3.150(b) of the Act, because at Dr. Aguilera's request, she supervised the paramedics. *Id.* at 123. The court noted that it was "uncontested that the paramedics were certified pursuant to the Act and that delivery of a baby [was] within the scope of emergency medical services contemplated by the Act." *Id.* Thus, the court determined that there was "no question that Dr. Kloempken was engaged in 'supervision' of 'emergency medical services personnel certified, licensed or authorized pursuant to [the] Act' and [that] her alleged misconduct occurred 'in connection with activities within the scope of [the] Act.' " *Id.* (quoting 210 ILCS 50/3.150(b) (West 1996)). Finally, the court determined that St. Francis

Hospital itself was immune pursuant to section 3.150(b), because, as the resource hospital, it "coordinates, monitors and supervises the *** EMS System" for its region. *Id.* at 129.

¶ 27    Bass argues that Dr. Strane was an "ER doctor providing care to Donail during a hospital to hospital transfer" and that he "was acting within his training as an *emergency room physician.*" (Emphasis in original.) Bass contends that the Act provides immunity to physicians only when supervising or instructing EMTs or paramedics, such as Dr. Kloempken was doing in *Washington*. However, we read neither the plain language of the Act nor the holding in *Washington* to contain such limitation. *Wilkins*, 2013 IL 114310, ¶¶ 20, 22. Applying the logic in *Washington* to the facts of this case leads to our outcome; that is, the immunity provided in section 3.150(a) applies to the services Dr. Strane delivered during Donail's emergency interhospital transport. Unlike Dr. Kloempken in *Washington*, Dr. Strane is an emergency physician who was familiar with and trained under the EMS System plan. Specifically, he was trained and certified in the plan protocols and authorized to participate as an ECP and flight physician. Furthermore, Dr. Strane was directed by Dr. Blumen, the acting EMS medical director, to assist in Donail's emergency transport, a medical service undisputedly contemplated by the Act. It then follows that, because Dr. Strane is immune, UCH is also immune from the plaintiff's claims based on vicarious liability. *Vancura v. Katris*, 238 Ill. 2d 352, 375 (2010). We therefore answer the certified question in the affirmative.

¶ 28    For the sake of completeness, we note that *Washington* similarly supports UCH's alternate argument that it is immune under section 3.150(b). That section states:

>     "(b) No person, including any private or governmental organization or institution that administers, sponsors, authorizes, supports, finances, educates or supervises the functions of emergency medical services personnel certified, licensed or authorized pursuant to this Act, including persons participating in a Department approved training program, shall be liable for any civil damages for any act or omission in connection with administration, sponsorship, authorization, support, finance, education or supervision of such emergency medical services personnel, where the act or omission occurs in connection with activities within the scope of this Act, unless the act or omission was the result of willful and wanton misconduct." 210 ILCS 50/3.150(b) (West 2012).

¶ 29    In *Washington*, the court determined that St. Francis Hopsital was immune from civil liability for Dr. Kloempken's role supervising paramedics on the telephone regarding a breech-baby delivery. *Washington*, 336 Ill. App. 3d at 129. The court determined that St. Francis, as its region's resource hospital, had to coordinate, monitor and supervise its EMS System. *Id.* Dr. Aguilera, in his capacity as the EMS Medical Director designee, chose to utilize Dr. Kloempken in the EMS System plan, despite her unfamiliarity with it, because of her obstetrical training and the nature of the plaintiff's emergency. *Id.* at 129-30.

¶ 30    Likewise, UCH, as the region's resource hospital, "administers *** or supervises the functions of emergency medical services personnel certified, licensed or authorized pursuant to [the] Act." 210 ILCS 50/3.150(b) (West 2012). Dr. Blumen, in his capacity as acting EMS medical director, decided that Donail's medical condition required medical emergency services exceeding the scope of services an EMT-paramedic could provide, and assigned Dr. Strane to assist in the transfer. Under these facts, like St. Francis Hospital in *Washington*, UCH is also immune from civil liability under section 3.150(b).

¶ 31    Finally, we reject the plaintiff's contention that our outcome somehow provides blanket immunity for practicing emergency physicians. On the contrary, the scope of services covered by the Act is limited to the emergency medical services described therein, which includes inter-hospital emergency transports of critically ill patients. Our decision further supports the policy behind the Act, as succinctly stated by another court:

> "[The Act] expressly states that the intent of this legislation is to provide Illinois a system for emergency medical services by establishing a central authority to coordinate and integrate the planning, evaluation, and regulation of prehospital emergency medical services systems. With that general purpose in mind, we are persuaded that by enactment of the immunity provision, the legislature intended to encourage emergency response by trained medical personnel without risk of malpractice liability for every bad outcome or unfortunate occurrence. Emergency situations are often fraught with tension, confusion, and, as here, difficult physical locations for giving medical care. Emergency personnel must not be afraid to do whatever they can under less than ideal circumstances." *Gleason v. Village of Peoria Heights*, 207 Ill. App. 3d 185, 188-89 (1990) (in context of EMTs' response to victim of diving accident at beach which resulted in quadriplegia despite efforts to stabilize spine at the scene and during transport to hospital).

¶ 32    For similar reasons, we believe the Act's immunity provision intended to cover those medical personnel attending to an emergency interhospital transport like Donail's. The various provisions of the Act make it clear that EMS medical directors are authorized to engage qualified medical personnel, including physicians, when an emergency situation necessitates medical services exceeding the skill of EMTs or paramedics and that such personnel must not be afraid to participate under the less-than-ideal conditions which exist during a frantic ambulance transport. An opposite outcome would serve to discourage EMS medical directors from utilizing medical personnel with advanced training during such emergencies and nonemergency transports, which would defeat the very purpose behind the Act and its immunity provision.

¶ 33    Based on the foregoing reasons, we answer the certified question in the affirmative and remand the cause to the circuit court for further proceedings consistent with this opinion.

¶ 34    Certified question answered; cause remanded.