In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 06-1685, 06-1522

EDWARD FAGOCKI, as administrator of
the estate of Shirley Johnson, deceased,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

ALGONQUIN/LAKE-IN-THE-HILLS FIRE
PROTECTION DISTRICT,

*Defendant-Appellant/*
*Cross-Appellee.*

_____

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 03 C 6015—**Morton Denlow**, *Magistrate Judge.*

_____

ARGUED JUNE 8, 2007—DECIDED JULY 13, 2007

_____

Before POSNER, FLAUM, and MANION, *Circuit Judges.*

POSNER, *Circuit Judge.* This is a suit for medical malpractice, governed, so far as relates to the appeals, by Illinois law. A jury awarded the plaintiff $1 million. Both parties appeal—the defendant arguing that it was entitled to judgment as a matter of law, the plaintiff arguing that he

was entitled to a larger damages award. The plaintiff's appeal is academic on the view we take of the case.

Shirley Johnson, a woman in her fifties weighing 300 pounds, had a severe allergic reaction to peanuts while eating at a Chinese restaurant. Her husband drove her to the nearby Provena Immediate Care Center. ("Immediate care centers," also called "walk-in clinics," provide non-emergency or "minor emergency" services to patients on a walk-in basis. *WebMD*, www.webmd.com/a-to-z-guides/Better-Care-at-Lower-Costs-Do-I-Need-to-Go-to-the-Emergency-Room (visited June 12, 2007).) When they arrived, at about 4:53 p.m., a nurse from the center saw that Mrs. Johnson, slumped in the passenger seat of the car and already comatose, was having serious difficulty breathing and her skin was turning blue. Walter Drubka, a physician at the center, was summoned. He immediately diagnosed anaphylactic shock and instructed his staff to call 911, inject Johnson with epinephrine (Johnson did not have an epipen with her—a syringe loaded with epinephrine that persons with serious food allergies are supposed to have with them at all times), and fetch him his equipment for treating a patient whose airway is blocked, a common consequence of anaphylactic shock. The equipment included an "Ambu bag," which is placed over the patient's face and forces oxygen into her lungs, and an endotracheal tube that is put through the patient's throat into her trachea, a procedure called intubation.

A team of five paramedics employed by the defendant came on the scene at 4:56, three minutes after the Johnsons had arrived at the immediate-care center. With some difficulty because of Mrs. Johnson's weight they removed her from the car and carried her to the ambulance (which took two minutes), meanwhile being briefed by Drubka,

who was using the Ambu bag on her without success. "Standing Medical Orders" (SMOs) issued pursuant to state health regulations for the guidance of paramedics and others who provide emergency medical treatment authorize a physician at the scene to take control of the patient. Drubka told the paramedics that Johnson had to be intubated immediately, and he offered to do so, but they declined his offer and said "we'll take care of it from here." (They denied at the trial that he made such an offer, but we must take the facts as favorably to the plaintiff as the record permits.) One of them, Corneliuson, had performed numerous intubations—at least twice as many as Drubka—and more recently than Drubka, who had performed his last one a year and a half earlier and who unlike Corneliuson was unaccustomed to working in the crowded confines of an ambulance.

Other paramedics in the group went to work administering (intravenously) to Mrs. Johnson a medicine like epinephrine called Benadryl. They did not try to administer epinephrine itself even though the Standing Medical Orders call for it to be administered first, in a case of anaphylactic shock, and Benadryl second.

Corneliuson could not intubate Johnson because Johnson's jaws were clenched shut. The paramedics administered intravenously a drug called Versed to loosen her jaws. The record does not indicate when they had clenched. Dr. Drubka had managed to insert an "oral airway"—a device for preventing the tongue from blocking the patient's airway—into Mrs. Johnson's mouth while she was slumped in her car, so her jaws could not have been clenched then. As Johnson was being transferred from car to ambulance, she fell off the gurney being used to carry her, owing to her weight, and the airway fell out. The

paramedics put her into the ambulance and one of them inserted another oral airway into her mouth. That was at 5:02 and it is at some unknown point after that that her jaws clenched, preventing Corneliuson from intubating her until the Versed took effect.

The fact of clenching is critical and so we note that the plaintiff does not take issue with the statement in the defendant's brief (filed first) that "after [Ambu] bagging Mrs. Johnson, Corneliuson attempted to open her mouth to intubate, but found her mouth was clenched shut." The plaintiff's brief states that "Versed was administered to Shirley Johnson because her jaw muscles needed to be relaxed." Had Johnson's jaws not been clenched, there would have been no reason to give her Versed. The plaintiff does not argue that the paramedics gave it to her unnecessarily, and this implies that her jaws were indeed clenched. In any event, "with immaterial exceptions, judges do not interrogate factual assertions made by a party unless his opponent contests them." *Herzog v. Village of Winnetka*, 309 F.3d 1041, 1042 (7th Cir. 2002).

The Standing Medical Orders to which we referred state that if the drug first used to sedate the patient so that she can be intubated doesn't work within a minute, another drug, Etomidate, should be administered forth-with. Instead of doing that the paramedics gave Mrs. Johnson further doses of Versed. With the ambulance now moving because the paramedics were eager to get Johnson to a hospital emergency room, a second attempt at intubation failed, but a third succeeded—or at least the paramedics thought it had succeeded—at approximately 5:22.

The ambulance arrived at the emergency room some three minutes later and thus about 29 minutes after the

paramedics had first arrived at the immediate care center. The staff of the hospital emergency room quickly discovered that the endotracheal tube was in Johnson's esophagus rather than her trachea. With some difficulty a doctor re-intubated Johnson properly. But by this time, and possibly a good deal earlier, she had suffered severe, irreversible brain damage precipitating her into a vegetative state in which she remained until she was pronounced dead some two and a half years later. Her medical expenses exceeded $1 million. The estate did not sue the Chinese restaurant (though Mrs. Johnson had before going there to eat asked the restaurant's staff whether its food contained peanuts and had been told it did not), but did sue Provena, the owner of both the hospital and the immediate care center, and Dr. Drubka, along with the paramedic service. The jury exonerated all but the last. (Ironically, Provena, though it was a defendant, is the most likely beneficiary of the verdict. The Johnsons were not well to do and in all likelihood could not have paid the huge hospital bill.)

Illinois's Emergency Medical Services Systems Act provides that a licensed emergency medical services provider, such as the defendant paramedic service, "who in good faith provides emergency . . . medical services . . . in the normal course of conducting their activities, or in an emergency, shall not be civilly liable as a result of their acts or omissions in providing such services unless such acts or omissions . . . constitute willful and wanton misconduct." 210 ILCS 50/3.150(a). The purpose of thus exempting emergency medical providers from liability for mere negligence is "to encourage emergency response by trained medical personnel without risk of malpractice liability for every bad outcome or unfortunate occurrence.

Emergency situations are often fraught with tension, confusion, and as here, difficult physical locations for giving medical care. Emergency personnel must not be afraid to do whatever they can under less than ideal circumstances." *Gleason v. Village of Peoria Heights*, 565 N.E.2d 682, 684 (Ill. App. 1990); see also *Bowden v. Cary Fire Protection District*, 710 N.E.2d 548, 552-53 (Ill. App. 1999); *Brock v. Anderson Road Ass'n*, 677 N.E.2d 985, 993 (Ill. App. 1997).

At common law, rescuers were fully liable for any negligence committed by them in the course of the rescue. *Nelson v. Union Wire Rope Corp.*, 199 N.E.2d 769, 773-74 (Ill. 1964); *Jackson v. City of Joliet*, 715 F.2d 1200, 1202 (7th Cir. 1983) (Illinois law) ("if you do begin to rescue someone you must complete the rescue in a nonnegligent fashion even though you had no duty of rescue in the first place"). This made sense when the intervention of an incompetent worsened the patient's condition or precluded intervention by a competent rescuer. *Cuyler v. United States*, 362 F.3d 949, 953-54 (7th Cir. 2004); *Stockberger v. United States*, 332 F.3d 479, 481 (7th Cir. 2003). But it had a tendency (as the Illinois cases emphasize) to deter even competent rescuers from volunteering their services, since if the rescue failed they might face a lawsuit. *Id.*; *Jennings v. Southwood*, 521 N.W.2d 230, 234 (Mich. 1994). The problem is especially acute if, as in a case such as this, the rescuer cannot seek restitution for the benefit conferred by a successful rescue. Nevertheless if the negligence system operated with a zero error rate, and if a successful defendant could recoup his attorney's fees, the rescuer would have no fear about having to defend against such a suit. But these conditions are not satisfied. Judges, jurors, and lawyers make mistakes and litigants in ordinary civil

litigation bear their litigation expenses even when they win. In addition, an employer is liable, by virtue of the doctrine of respondeat superior, for the negligent acts of an employee even if there was no way the employer could have prevented them.

So Illinois has decided to restrike the balance by exempting licensed providers of emergency medical treatment from liability for negligence. They remain liable if they are "willful and wanton," but what does that doublet mean? The definitions in the Illinois cases are not very helpful, in part because general statements often make a poor match with specific facts and in part because the definitions are not uniform. In one case we read that "willful and wanton misconduct approaches the degree of moral blame attached to intentional harm, since the defendant deliberately inflicts a highly unreasonable risk of harm upon others in conscious disregard of it." *Burke v. 12 Rothschild's Liquor Mart, Inc.*, 593 N.E.2d 522, 530-31 (Ill. 1992); see also *American National Bank & Trust Co. v. City of Chicago*, 735 N.E.2d 551, 557 (Ill. 2000); *Lynch v. Board of Education*, 412 N.E.2d 447, 457 (Ill. 1980). Similarly, *Pfister v. Shusta*, 657 N.E.2d 1013, 1016 (Ill. 1995), defines "willful and wanton" as exhibiting "an utter indifference to or conscious disregard for" safety. Yet in another case we find both language similar to the above and statements that "willful and wanton" may be synonymous with "gross negligence" and that "under the facts of one case, willful and wanton misconduct may be only degrees more than ordinary negligence, while under the facts of another case, willful and wanton acts may be only degrees less than intentional wrongdoing." *Ziarko v. Soo Line R.R.*, 641 N.E.2d 402, 406 (Ill. 1994); see also *Kirwan v. Lincolnshire-Riverwoods Fire Protection District*, 811 N.E.2d 1259, 1264-65 (Ill. App. 2004).

We get only a little more guidance from cases in which
paramedics are accused of willful and wanton miscon-
duct. Two nearly identical failed-intubation cases exonerat-
ing the paramedics—*Brock* and *Bowden*, cited earlier—quote
the high threshold for liability announced in the *Pfister*
case. In three other cases, the paramedics lost. In *American
National Bank & Trust Co. v. City of Chicago*, *supra*, they
had responded to a 911 call by a woman who told the 911
operator that she was having an asthmatic attack and
thought she was dying. The paramedics arrived at the
woman's apartment, knocked on the door, heard nothing,
and left. The door was unlocked, but they had not bothered
to turn the doorknob. She died. In *Prowell v. Legretto
Hospital*, 791 N.E.2d 1261, 1262 (Ill. App. 2003), summary
judgment for the defendant was reversed because of
evidence that the paramedics "knew that [the plaintiff's
decedent, killed when the stretcher she was on collapsed]
was not secured to the stretcher, that the stretcher's
legs were not locked, that the [paramedics] placed the
stretcher on a pothole, making it highly unstable, and that,
despite their knowledge of the instability of the stretcher,
[they] did not maintain physical contact with the
stretcher." In the third case, the one closest to ours, the
court ruled that a complaint was sufficient to state a claim
against paramedics when it alleged that "despite defen-
dants' knowledge prior to their arrival on the scene that
decedent was having difficulty breathing and her throat
was closing due to an allergic reaction, and despite their
training and standard operating procedures and accepted
emergency practices, they waited between seven and
eight minutes to administer two of the necessary med-
ications and never administered the third. In cases of life-
threatening emergencies, seven or eight minutes can be a
significant delay that could amount to 'utter indifference'

or 'conscious disregard' for decedent's safety." *Kirwan v. Lincolnshire-Riverwoods Fire Protection District*, *supra*, 811 N.E.2d at 1264. Of course "could" in the last sentence is critical, as the only issue was the sufficiency of the pleading.

Our plaintiff's best evidence is the paramedics' failure to detect that the final effort at intubation, which the paramedics thought successful, had failed. It may not have failed; instead the endotracheal tube may have become dislodged while Johnson was being moved from the ambulance to the hospital emergency room. But there is some evidence, which the jury was entitled to credit, that it was inserted incorrectly in the first place, into her esophagus rather than into her trachea. No one supposes an incorrect insertion itself, in a moving ambulance, negligent. Nor is there evidence that Dr. Drubka is a more competent intubator than paramedic Corneliuson—indeed, had she stood aside for him to do the intubation and he had botched it, the plaintiff would be arguing that she should have ascertained that he had done fewer intubations than she and none within the last year and a half or ever in the cramped interior of an ambulance. The contention by one of the plaintiff's experts (a contention abandoned by the plaintiff in this court) that the paramedics should have brought Johnson into the immediate care center for intubation because it was roomier than the ambulance and the lighting was better is specious, since the detour would have significantly delayed getting Mrs. Johnson to the hospital emergency room.

There are, however, procedures for checking that the endotracheal tube is in the right place, and so the paramedics' failure to detect the misplacement of the tube may have been negligent. But such a failure would not amount

to willful and wanton misconduct without circumstances of aggravation. And of that the only evidence is the testimony of one of the plaintiff's experts that "I could see nowhere in their record that they confirmed the tube placement by chest rise, [or] by that little device you could put on the end of the tube that changes colors if you are in the proper place in the trachea." Given the pressure of time under which the paramedics were laboring, the failure to have made a written notation of having checked for the correct placement of the tube is too thin to justify an inference of willful and wanton misconduct.

And suppose the paramedics *had* detected the incorrect placement (if the tube was placed incorrectly, as we're assuming). There is no evidence they would have had an easier time successfully re-intubating than the emergency-room physician, so at best Johnson would have been intubated a minute or two before she was intubated in the emergency room. There is no evidence that that minute or two would have prevented her descent into a vegetative state.

The plaintiff insists that a defendant can be liable for aggravating a preexisting injury, and that of course is true. But the defendant can be liable only for the aggravation, and not for the consequences of the original injury—the consequences the victim would have suffered even if the defendant had committed no tort. *Tedeschi v. Burlington Northern R.R. Co.*, 668 N.E.2d 138, 140-41 (Ill. App. 1996); *Gruidl v. Schell*, 519 N.E.2d 963, 967 (Ill. App. 1988); *Reising v. United States*, 60 F.3d 1241, 1244 (7th Cir. 1995) (Illinois law). If willful and wanton misconduct occurred only after Mrs. Johnson had lapsed into an irrevocable vegetative state, she has no claim for damages.

Passing to another of the plaintiff's contentions vulnerable to the point just made, we find no evidence that administering epenephrine at the first opportunity would have made a difference to Johnson's breathing, for by then anaphylactic shock had shut down her airway. And as for the failure to administer Etomidate after the first dose of Versed failed to unlock her jaws, this could not even be negligence because the only relevant difference between the two drugs—according to the plaintiff's own expert—is that Etomidate causes unconsciousness while Versed does not, and she was already unconscious. The purpose of the Versed was to cause her jaws to unclench—and was accomplished.

The plaintiff might have been able to mount a somewhat stronger argument for liability than he did. Mrs. Johnson's jaws could not have clenched until sometime after 5:02, when the second airway was placed in her mouth. That was four minutes after the paramedics had placed her in the ambulance. It could be argued that it was negligent of them or worse not to attempt to intubate her within that period. But the plaintiff does not make this argument. Instead he presses the factually unsupportable claim that the paramedics were willful and wanton in failing to try to intubate her until 13 minutes had elapsed since their arrival. Apart from the two minutes it took to place her in the ambulance, the plaintiff concedes that during some part of the remaining 11 minutes Mrs. Johnson's jaws were clenched and intubation therefore impossible. So no reasonable jury could have found that the paramedics failed culpably for 11 minutes to try to intubate her.

It is not proper for an appellate court in an adversary system of civil justice to quarry the record for good factual

arguments which a party failed to make and to which, therefore, his opponent had no occasion to respond. "It is the parties' duty to package, present, and support their arguments." *Roger Whitmore's Automotive Services, Inc. v. Lake County*, 424 F.3d 659, 664 n. 2 (7th Cir. 2005). In any event a finding that the four-minute delay in trying to intubate Mrs. Johnson before the earliest time at which her jaws clenched was willful and wanton could not be sustained on this record. Dr. Drubka left the ambulance at 4:59 and until he left was in charge of the patient (as the plaintiff concedes and indeed asserts) as the only physician present. This left only three minutes before Johnson's jaws may have clenched shut. The Ambu bag was on Mrs. Johnson's face, and standard medical procedure requires that before intubation is attempted the patient be oxygenated for three minutes. There is no evidence that Corneliuson knew how long the Ambu bag had been on Johnson's face or how much oxygen she had received. Apparently even with the airway so far shut down as to necessitate intubation, the Ambu bag can force some oxygen into the patient's lungs.

The Versed, moreover, was administered intravenously. The plaintiff does not deny that the paramedics had difficulty locating a vein for this purpose because when an obese person loses oxygen her veins tend to "collapse." Nor does he question that the Versed had to be administered intravenously to be effective. There is no evidence it could have been administered intravenously and taken effect before 5:09, when the first attempt at intubation was made. In similar circumstances a delay in intubation was held to be, as a matter of law, not willful and wanton within the meaning of Texas's counterpart to Illinois's Emergency Medical Services Systems Act. *Dunlop v. Young*, 187 S.W.3d 828, 829-30 (Tex. App. 2006).

But, argues the plaintiff (again skirting the issue of causation), the important thing is that the paramedics violated the Standing Medical Orders. That is both a wrong argument (see *McCoy v. Hatmaker*, 763 A.2d 1233, 1236-38 (Md. Ct. Spec. App. 2000)) and a bad one. It is wrong because the SMOs are by their terms to be followed only "as circumstances allow," and here they did not allow, as will often be the case. Suppose Dr. Drubka were a psychiatrist who had never performed an intubation but thought Mrs. Johnson would be a good patient to practice on. Corneliuson would not have been violating the standard of care set forth in SMOs by refusing to let him do it.

The argument is bad rather than just unsound because of the perverse incentive it would create if accepted. Affirming the judgment in this case on the ground that compliance with the Standing Medical Orders is mandatory would send a signal to paramedics that they have a safe harbor from lawsuits if they comply with the SMOs to the letter, whatever the consequences for the patient. The Illinois legislature and courts would not want us to send such a signal; it would preserve the statutory immunity at the cost of needlessly endangering persons in desperate need of emergency care.

The estate has no case as a matter of law. The judgment is reversed with directions to enter judgment for the defendant.

REVERSED.

A true Copy:

       Teste:

                    _____

                    *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*