2020 IL App (1st) 191812

FIRST DISTRICT,
FIRST DIVISION
December 28, 2020

No. 1-19-1812

| | | |
|---|---|---|
| SALLY GARY, as Administrator of the Estate of Amanda Gary, Deceased, | ) ) ) | Appeal from the Circuit Court of Cook County, Illinois. |
| Plaintiff-Appellant, | ) | |
| v. | ) | No. 15 L 66043 |
| | ) | |
| THE CITY OF CALUMET CITY, | ) | Honorable |
| | ) | Carrie E. Hamilton, |
| Defendant-Appellee. | ) | Judge Presiding. |

JUSTICE COGHLAN delivered the judgment of the court, with opinion.
Presiding Justice Walker and Justice Pierce concurred in the judgment and opinion.

**OPINION**

¶ 1    On October 12, 2014, 31-year-old Amanda Gary suffered a severe asthma attack. Her mother, plaintiff Sally Gary, called 911. Paramedics from the Calumet City Fire Department administered treatment to Amanda and brought her to the hospital. Amanda died 10 days later. Sally, as administrator of Amanda's estate, brought a wrongful death suit against Calumet City, alleging that improper treatment by the City's paramedics proximately caused her daughter's death.

¶ 2    Under the Emergency Medical Services Systems Act (EMS Act), the City is immune from civil liability for the provision of medical services in good faith, except in cases of willful and wanton misconduct. 210 ILCS 50/3.150(a) (West 2014). The trial court found that the evidence did not support a conclusion that the City's paramedics acted willfully and wantonly, and it granted summary judgment for the City. Plaintiff now appeals. For the reasons that follow, we affirm.

¶ 3                                                         BACKGROUND

¶ 4          In her amended complaint, plaintiff alleged that the responding paramedics made a series of errors that led to her daughter's death. First, although Amanda's blood oxygen levels were dangerously low when the paramedics arrived on the scene, the paramedics unnecessarily delayed intubating her for 14 minutes. Second, when they finally did intubate her, they inserted the breathing tube into her esophagus rather than her trachea. Third, they failed to monitor Amanda's blood oxygen level after intubation and, therefore, failed to discover the tube was placed incorrectly.

¶ 5          In support of her complaint, plaintiff submitted a healing arts malpractice affidavit by Dr. John Ortinau pursuant to section 2-622 of the Code of Civil Procedure (735 ILCS 5/2-622 (West 2014)). Dr. Ortinau opined that the aforementioned errors constituted deviations from the standard of care and that they contributed to a prolonged state of hypoxia (*i.e.*, absence of sufficient oxygen to maintain bodily functions), which led to Amanda's death.

¶ 6          The following facts were adduced in discovery, which included the depositions of the paramedics and doctors who treated Amanda. On October 12, 2014, at approximately 10:30 p.m., Amanda was at home when she suffered an asthma attack. Sally called 911, and paramedics Ryan Banks and Chris Pierce responded to the scene. Banks observed that Amanda was in severe respiratory distress; she was wheezing and unable to speak in complete sentences. He gave her a breathing mask and administered albuterol. Pierce placed a pulse oximeter—a device that measures a patient's pulse and the amount of oxygen saturation in their blood—on Amanda's finger. Amanda had a blood oxygen level of 54%. (A healthy person normally has a blood oxygen level above 96%.) Amanda commented that the number was low, then fell unconscious.

¶ 7        According to Banks and Pierce, when a patient falls unconscious, it indicates that not enough oxygen is reaching her brain, and it is important to supply her with oxygen as soon as possible. However, they decided not to intubate Amanda in the house for multiple reasons: her mother was nearby and "really anxious"; a child was screaming; and it was dark and difficult to see. Instead, Banks gave Amanda some assisted respirations with a bag valve mask, and then he and Pierce brought her to the ambulance. She was still breathing on her own at this time.

¶ 8        At the ambulance, before the paramedics intubated Amanda, they spent five minutes establishing an intraosseous line (*i.e.*, into bone marrow) through which they administered Versed, a paralytic drug. Pierce explained that, even with an unconscious patient, Versed must be administered prior to intubation if the patient has a gag reflex, because otherwise the patient might vomit and then aspirate the vomit.

¶ 9        Pierce then performed the intubation. Because Amanda's trachea was swollen from her asthma, he had to use force to insert the breathing tube. He stated that he was sure he placed the tube in her trachea and not in her esophagus. He estimated that it took around 12 minutes from the time she fell unconscious to the time she was intubated. Banks, observing the intubation, saw the tube pass through Amanda's vocal cords, an indication that the tube was in the right place.

¶ 10        After a patient is intubated, paramedics consider multiple factors to determine whether the intubation has been performed correctly: lung sounds, lack of abdominal sounds (which would indicate placement in the esophagus), chest rise and fall, $CO_2$ readings, and pulse oximeter readings. Banks and Pierce heard only "diminished" lung sounds, but they did not hear any abdominal sounds, and the $CO_2$ detector reflected a positive change. Banks also observed Amanda's chest rising and falling. Thus, they concluded that the intubation was a success.

¶ 11    However, Banks and Pierce did not record any pulse oximeter readings from Amanda after the initial 54% reading in her home. Banks stated that the pulse oximeter "[p]robably" fell off her finger in the house but, in any event, they would not have used that pulse oximeter in the ambulance; they would have used the one attached to the cardiac monitor. But no such readings were listed in their incident report, and Banks did not independently recall if they obtained any such readings.

¶ 12    Once the intubation was complete, Pierce called St. Margaret North Hospital to inform them that a critical patient was incoming. The drive to the hospital took three to four minutes. At the hospital, the paramedics transferred care to emergency room personnel. Both Banks and Pierce did not believe Amanda was in pulseless cardiac arrest at the time. Pierce specifically recalled she had a pulse when they brought her out of the ambulance.

¶ 13    Hospital records indicate that Amanda was admitted at 11:02 p.m. She was treated in the emergency room by Dr. Maria Cole, an internal medicine physician who is also board-certified in emergency medicine, and Dr. Lisa Mussman[1], a third-year resident assisting her. Neither doctor watched the stretcher being removed from the ambulance and brought inside the hospital doors, but they were both waiting and ready to interact as soon as Amanda arrived.

¶ 14    Within a minute of Amanda's arrival, Dr. Cole and Dr. Mussman observed she had no pulse and was in cardiac arrest. She was not making any breath sounds, and there were audible sounds over her stomach, indicating that the breathing tube was in her esophagus. Thus, the doctors removed the tube and reintubated her at 11:05 p.m.

¶ 15    Dr. Cole opined that Amanda was improperly intubated prior to arrival, because her lack of pulse indicated that she had not been properly oxygenated. She had no opinion as to how long

---

[1]Dr. Mussman is sometimes also referred to as Dr. Johnson in the record.

Amanda had been improperly intubated, though she stated it generally takes five to seven minutes without oxygen for a person to go into cardiac arrest. She acknowledged it was possible that the breathing tube was initially placed properly but shifted when Amanda was transferred from the ambulance to the hospital, but she "[v]ery rarely" observed such shifts in other patients.

¶ 16     Dr. Mussman opined that the breathing tube had been in Amanda's esophagus for "quite a while" based on her pupils, which were fixed and dilated. She said it would generally take at least 10 minutes without oxygen for a person's pupils to reach that state, although the exact time could vary based on the individual. She further opined that it was not possible for a properly placed tube to shift into the esophagus, because "[i]t's a very long airway and they are two separate tubes side by side." In her four years of residency, she estimated that she had to reintubate patients in only 1 to 3% of cases.

¶ 17     Banks did not dispute that the hospital staff found the breathing tube in Amanda's esophagus, but he denied that it was originally placed there. He speculated that the tube moved when Amanda was transferred from the stretcher to the hospital bed. Pierce similarly speculated that because Amanda's trachea was so tight, the tube "slipped out."

¶ 18     Dr. Bruna Arrentegui-Rodriguez treated Amanda starting on October 13, 2014, the day after she was admitted to the hospital. At the time, Amanda was in the intensive care unit, in cardiac arrest and experiencing seizures due to brain damage caused by lack of oxygen. She never regained consciousness. On October 22, 2014, she was declared brain-dead, and life support was withdrawn.

¶ 19     Dr. Arrentegui-Rodriguez stated that, if a patient is improperly intubated, the resulting lack of oxygen can lead to respiratory failure. But she could not say with 100% certainty that improper intubation caused Amanda's condition, since it was impossible to know what would

have happened if she had been properly intubated from the start. Regarding the possibility that the tube shifted, Dr. Arrentegui-Rodriguez stated that moving a patient could dislodge a properly placed tube, but she did not think the tube could move into the esophagus.

¶ 20    All three doctors were asked to comment on the paramedics' care of Amanda based on the paramedics' incident report. Dr. Cole stated that the paramedics' report did not reflect that they incorrectly intubated her. Dr. Arrentegui-Rodriguez stated that monitoring a patient's pulse oximeter readings after intubation would be "helpful" and "appropriate" (though she declined to state that it was "necessary"). Finally, Dr. Mussman stated, that in a hospital setting, she would "definitely" monitor pulse oximeter readings on an intubated patient, because if the tube was placed incorrectly, the patient's oxygen saturation could decrease. However, she stated that pulse oximeter readings can be inaccurate, and she cited a number of other factors to consider, including seeing the tube go through the vocal cords, listening for lung sounds, using a $CO_2$ detector, and watching for condensation in the tube. Dr. Cole and Dr. Arrentegui-Rodriguez similarly acknowledged that pulse oximeter readings can be inaccurate for a variety of reasons, including nail polish and skin temperature.

¶ 21    Finally, in regards to their training, both Banks and Pierce referenced various Standing Medical Orders (SMOs) that they were trained to follow. SMO Code 75, governing intubations, called for "[c]ontinuous pulse oximetry and cardiac monitoring." However, deputy fire chief Peter Bendinelli, who was in charge of the fire department's emergency medical services training from 2009 to 2017, opined that pulse oximeter readings were not important in assessing an intubation. He gave two reasons: First, the readings might be inaccurate. Second, even if accurate, a drop in blood oxygen levels might be caused by patient heart failure rather than an error in intubation. Thus, rather than relying on a pulse oximeter, Bendinelli would consider lung

and abdominal sounds, chest rise and fall, $CO_2$ monitoring, the presence of condensation on the breathing tube, and the color of the patient's skin. Bendinelli trained ambulance crews in accordance with this protocol.

¶ 22    Based on the foregoing facts, the City moved for summary judgment, arguing that plaintiff had presented no evidence that would support a conclusion that the paramedics' actions were willful and wanton. The City argued that (1) the evidence showed that Amanda was intubated at the earliest possible time, (2) even assuming *arguendo* that the intubation was performed incorrectly, the paramedics' error would not constitute willful and wanton conduct in light of the "difficult and chaotic emergency circumstances," and (3) the paramedics used reliable methods to assess and monitor the intubation ($CO_2$ monitoring and listening to the lungs and abdomen).

¶ 23    In response, plaintiff argued that the issue of willful and wanton conduct was a question of fact for the jury to decide. In particular, she argued that the incorrect placement of the breathing tube was willful and wanton, particularly in light of the paramedics' failure to obtain any pulse oximeter readings after the initial 54%.

¶ 24    On August 9, 2019, the trial court granted the City's motion for summary judgment, stating that "[t]his is precisely the type of case that falls within the EMS Act." The court found it particularly significant that "the paramedics did check multiple times and in multiple ways to ensure that the intubation was done correctly." In light of this fact, the court stated the paramedics' failure to obtain pulse oximeter readings "does not amount to negligence, let alone willful and wanton." The court also declined to consider Dr. Ortinau's affidavit as competent evidence, since Dr. Ortinau formed his opinion prior to any discovery and the record did not reflect that he maintained his opinion after reviewing the entire discovery.

¶ 25                                    ANALYSIS

¶ 26       We review the trial court's grant of summary judgment *de novo* (*Williams v. Manchester*,

228 Ill. 2d 404, 417 (2008)), keeping in mind that summary judgment is only appropriate where

"there is no genuine issue as to any material fact and *** the moving party is entitled to a

judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). Thus, we construe the record

strictly against the movant and liberally in favor of the nonmoving party. *Williams*, 228 Ill. 2d at

417. To prevail, the nonmoving party must present some evidence that would arguably entitle her

to recover at trial. *Keating v. 68th & Paxton, L.L.C.*, 401 Ill. App. 3d 456, 472 (2010).

¶ 27       Plaintiff argues that the trial court erred in finding, as a matter of law, that the City was

immune from liability under section 3.150(a) of the EMS Act. That section provides:

>      "Any person, agency or governmental body certified, licensed or authorized pursuant to
>
>      this Act or rules thereunder, who in good faith provides emergency or non-emergency
>
>      medical services *** in the normal course of conducting their duties, or in an emergency,
>
>      shall not be civilly liable as a result of their acts or omissions in providing such services
>
>      unless such acts or omissions *** constitute willful and wanton misconduct." 210 ILCS
>
>      50/3.150(a) (West 2014).

The purpose behind such immunity is "to encourage emergency response by trained medical

personnel without risk of malpractice liability for every bad outcome or unfortunate occurrence."

*Gleason v. Village of Peoria Heights*, 207 Ill. App. 3d 185, 188-89 (1990). Emergency situations

are often fraught with tension and confusion, and medical personnel "must not be afraid to do

whatever they can under less than ideal circumstances." *Id.* at 189.

¶ 28       Nevertheless, section 3.150(a) provides no immunity for willful and wanton misconduct,

which is defined as conduct exhibiting " 'an utter indifference to or conscious disregard for a

person's own safety or the safety or property of others.' " *Bowden v. Cary Fire Protection District*, 304 Ill. App. 3d 274, 280 (1999) (quoting *Pfister v. Shusta*, 167 Ill. 2d 417, 421-22 (1995)). Such conduct lies between intentional and merely negligent conduct. *Kirwan v. Lincolnshire-Riverwoods Fire Protection District*, 349 Ill. App. 3d 150, 155 (2004). The Restatement, which terms such behavior "reckless misconduct" (see Restatement (Second) of Torts § 500 Scope Note, at 587 (1965)), explains:

> "[Reckless misconduct] differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. *** [T]he actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent." Restatement (Second) of Torts § 500 cmt. g, at 590 (1965).

¶ 29    Here, plaintiff argues that genuine issues of material fact exist regarding whether the paramedics acted with reckless disregard for Amanda's well-being. Courts have considered this issue many times in the context of emergency responses to asthma patients and other patients with difficulty breathing. In *American National Bank & Trust Co. v. City of Chicago*, 192 Ill. 2d 274 (2000), and *Abruzzo v. City of Park Ridge*, 2013 IL App (1st) 122360, there was a question of fact as to whether the responding paramedics acted willfully and wantonly. But in *Bowden*, 304 Ill. App. 3d 274, and *Fagocki v. Algonquin/Lake-In-The-Hills Fire Protection District*, 496 F.3d 623 (7th Cir. 2007), there was not, and defendants were entitled to judgment as a matter of

law. For the reasons that follow, we find the instant case analogous to *Bowden* and *Fagocki* rather than *American National Bank* and *Abruzzo*.

¶ 30        In *American National Bank*, 192 Ill. 2d at 276, the decedent suffered an asthma attack and called 911, saying that she thought she was going to die. The dispatcher did not try to keep her on the phone, and the responding paramedics left after receiving no response to knocks at her apartment, even though her door was unlocked. *Id.* at 276-77. Based on these allegations, our supreme court held that the complaint stated a cause of action for willful and wanton conduct, explaining: "Locating a person in need of emergency medical treatment is the first step in providing life support services. Not even that first step was taken here." *Id.* at 286.

¶ 31        In *Abruzzo*, 2013 IL App (1st) 122360, Larry Furio entered the bedroom of his 15-year-old son Joseph and found him purple, gasping for breath, and unresponsive. Larry called 911 and administered cardiopulmonary resuscitation to Joseph. By the time paramedics arrived, Joseph had regained consciousness and was able to sit up and say some words. The paramedics visually assessed him, said words to the effect of " 'He looks alright I guess,' " and left without providing treatment. *Id.* ¶ 8. The next morning, Larry found Joseph unconscious and blue. He called 911 again, and Joseph was transported to the hospital where he was pronounced brain-dead. *Id.* ¶ 28. The *Abruzzo* court found a question of fact as to whether the paramedics who responded to the first 911 call acted with conscious disregard for Joseph's safety by failing to treat him and bring him to the hospital. *Id.* ¶ 84.

¶ 32        By contrast, in *Bowden* and *Fagocki*, no willful and wanton misconduct was found where the responding paramedics provided extensive treatment to the decedents. In *Bowden*, 304 Ill. App. 3d at 276, Bowden had a severe asthma attack in his home, and his son called 911. The responding paramedics assessed Bowden's medical condition, obtained his medical history,

"bagged" him with high-flow oxygen, and brought him to the ambulance for immediate transport to the hospital. En route, he went into full cardiopulmonary arrest. Per hospital instructions, the paramedics stopped the ambulance and attempted to intubate Bowden, but they were unsuccessful. Again per hospital instructions, they did not try a second time but administered additional oxygen while continuing to the hospital. There, Bowden was maintained on life support until he died eight days later.

¶ 33        Under these facts, the *Bowden* court held that summary judgment for defendant was appropriate. The court explained: "[I]n light of the undisputed evidence of the extensive treatment provided by the EMTs, there simply is no evidence that they showed an utter indifference to the decedent's safety." *Id.* at 282. The court further stated that, "[a]lthough there is no question that the result here was tragic, it is inappropriate to examine the case in hindsight and second-guess every action taken by the EMTs in rendering emergency treatment to the decedent." *Id.* at 283-84.

¶ 34        In *Fagocki*, 496 F.3d at 624, the decedent had a severe allergic reaction to peanuts, and her husband drove her to a nearby immediate-care center. Staff at the center saw her condition and called 911. When paramedics arrived, they administered Benadryl and brought her into the ambulance. They attempted to intubate her but discovered her jaws were clenched shut and administered Versed to her intravenously. After the Versed took effect, they attempted to intubate her a second time (unsuccessfully) and a third time (successfully, or so they thought). Upon her arrival at the hospital, emergency room staff discovered that the breathing tube was in the decedent's esophagus rather than her trachea, and they reintubated her properly. *Id.* at 626. By then, she had suffered severe brain damage precipitating her into a vegetative state from which she never recovered.

¶ 35    The *Fagocki* court reversed the trial court's judgment for the estate, holding that the paramedics' actions were not willful and wanton as a matter of law. *Id.* at 630. In doing so, the court explicitly rejected the proposition that the improper third intubation was willful and wanton, stating: "No one supposes an incorrect insertion itself, in a moving ambulance, negligent." *Id.* at 628. The court further stated that the paramedics' failure to detect the incorrect tube placement "may have been negligent" but "would not amount to willful and wanton misconduct without circumstances of aggravation." *Id.*; see also *Brock v. Anderson Road Ass'n*, 287 Ill. App. 3d 16, 26-27 (1997) (paramedics who provided "extensive care" to heat stroke victim did not act willfully and wantonly despite multiple alleged errors in care; even if errors were negligent, they did not indicate an utter indifference to patient's safety).

¶ 36    In the instant case, as in *Bowden* and *Fagocki* and unlike in *American National Bank* and *Abruzzo*, it is undisputed that the paramedics engaged in extensive efforts to save Amanda's life. They administered albuterol and measured her blood oxygen level; when she fell unconscious, they gave her assisted aspirations with a bag valve mask and brought her to the ambulance. There, they administered Versed to prevent her from vomiting and aspirating her own vomit, and then Pierce intubated her. After the intubation, they observed multiple factors that led them to believe it had been performed correctly: they heard sounds from her lungs (albeit diminished), did not hear sounds from her abdomen, and saw a positive change in the $CO_2$ detector. Banks also observed her chest rising and falling.

¶ 37    Construing the record liberally in favor of plaintiff (*Williams*, 228 Ill. 2d at 417), a reasonable finder of fact could conclude that Pierce performed the intubation incorrectly by inserting the tube into Amanda's esophagus rather than her trachea. A finder of fact could also reasonably conclude that this error might have been discovered and fixed prior to Amanda's

arrival at the hospital if the paramedics had used a pulse oximeter to continuously monitor Amanda's blood oxygen levels. But even taking these things as true, such errors do not reflect "an utter indifference to the decedent's safety" (*Bowden*, 304 Ill. App. 3d at 282) as required for a finding of willful and wanton misconduct. This is particularly true where, as here, the paramedics utilized multiple other methods to assess the intubation in a tense and time-sensitive emergency situation. In this regard, this case contrasts starkly with *Abruzzo*, 2013 IL App (1st) 122360, ¶ 8, where the responding paramedics gave only a cursory visual assessment to the decedent before concluding that he "look[ed] alright" and leaving.

¶ 38      Plaintiff nevertheless argues that the present case is analogous to *Meck v. Paramedic Services of Illinois*, 296 Ill. App. 3d 720 (1998), and *Prowell v. Loretto Hospital*, 339 Ill. App. 3d 817 (2003). We find these cases inapposite.

¶ 39      The sole issue in *Meck* was proximate causation—specifically, whether the decedent's estate was required to prove the decedent had a greater than 50% chance to survive absent the paramedics' alleged misconduct. *Meck*, 296 Ill. App. 3d at 725-26. The *Meck* court answered this question in the negative and reversed summary judgment for defendants on that basis alone. *Id.* at 726-27. The parties did not argue, and the *Meck* court did not discuss, whether the paramedics' actions could be construed as willful and wanton.

¶ 40      As for *Prowell*, 339 Ill. App. 3d at 818, it is readily distinguishable on its facts. The decedent in *Prowell* was transported to the hospital by ambulance. Upon arrival, as she was removed from the ambulance on a stretcher, she fell onto a concrete ramp and sustained injuries that resulted in her death. The *Prowell* court found a question of fact as to whether the paramedics acted willfully and wantonly, based on evidence that they had actual knowledge that the stretcher was not secure (*id.* at 824) and that they left the stretcher unattended, allowing it to

roll into a pothole (*id.* at 825-26). But in making this finding, the *Prowell* court explicitly distinguished *Bowden* on grounds that "the factual questions [in *Bowden*] concerned the quality of the EMTs' efforts to provide care to the decedent." *Id.* at 825. Here, too, the factual questions concern the quality of the paramedics' efforts to provide care to Amanda. Accordingly, *Prowell* is inapposite.

¶ 41     Finally, plaintiff argues that there is an issue of fact as to whether the City committed willful and wanton misconduct in its training of ambulance crews. She cites the deposition of Bendinelli, who stated that he trained ambulance crews not to rely on pulse oximetry to measure the success of an intubation but, instead, to consider lung and abdominal sounds, chest rise and fall, $CO_2$ monitoring, the presence of condensation on the breathing tube, and the color of the patient's skin. Bendinelli explained that pulse oximeter readings could be inaccurate and did not always reflect whether the breathing tube was placed correctly.

¶ 42     To defeat summary judgment, plaintiff would have had to present evidence that the City either knew Bendinelli's training imperiled patients or that the City failed to recognize this danger through recklessness. *Affatato v. Jewel Cos.*, 259 Ill. App. 3d 787, 800 (1994). Plaintiff presented no such evidence. On the contrary, all three of Amanda's treating physicians corroborated Bendinelli's statement that pulse oximeter readings can be inaccurate. In light of their testimony, plaintiff has not presented an issue of fact as to whether Bendinelli's training reflects an utter indifference to patients' safety. See *Bowden*, 304 Ill. App. 3d at 282.

¶ 43                              CONCLUSION

¶ 44     For the foregoing reasons, we affirm the trial court's grant of summary judgment for the City on the basis of immunity from suit under the EMS Act.

¶ 45     Affirmed.

**No. 1-19-1812**

| | |
|---|---|
| **Cite as:** | *Gary v. City of Calumet City*, 2020 IL App (1st) 191812 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-L-66043; the Hon. Carrie E. Hamilton, Judge, presiding. |
| **Attorneys for Appellant:** | Brian C. Thomas, of Thomas Law, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Robert Wilder, of Odelson & Sterk, Ltd., of Evergreen Park, for appellee. |